**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

EDWARD E. KELLY, JR.              : CIVIL ACTION
                                  :
        vs.                       :
                                  : NO. 08-CV-1952
MICHAEL J. ASTRUE, Commissioner   :
of Social Security                :

## MEMORANDUM AND ORDER

**JOYNER, J.**                                    **August 20, 2009**

This Social Security case is now before the Court for disposition of the objections of the Defendant, Commissioner of Social Security, to the July 1, 2009 Report and Recommendation of U.S. Magistrate Judge Carol Sandra Moore Wells that this matter be remanded for proper determination of (1) whether Plaintiff's back condition existed prior to June 30, 1999, (2) what his residual functional capacity is and (3) whether he can perform his past relevant work. For the reasons which follow, we find the Commissioner's objections to be well-founded and we therefore decline to adopt the Report and Recommendation.

## History of the Case

The Plaintiff, Edward Kelly, who is presently 61 years of age, last worked in 1995. On February 10, 2005, he applied for disability insurance benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §401, et. seq., claiming that he had been

disabled within the meaning of the Act since November 1, 1997.[1]
Prior to the alleged onset of his disability, Mr. Kelly had been
employed and self-employed as a stone mason, masonry supervisor,
and as an aide in an adult residential care facility.  (A.R.
219).  He has little formal education, having completed only the
7th grade.  (A.R. 66).

Mr. Kelly filed his application for social security
disability benefits on February 10, 2005 which was subsequently
denied.  The plaintiff then sought and was granted a hearing
before an Administrative Law Judge and the matter was ultimately
heard by Judge Paula F. Garrety on January 10, 2007.  Both
plaintiff and the Administrative Law Judge were in agreement that
his date last insured was June 30, 1999.[2]

At the hearing, Mr. Kelly and his wife (with whom he
resides) testified that he suffered a work-related injury to his
back for which he underwent surgery in or around 1978; he
ultimately settled the worker's compensation claim for that
injury for approximately $60,000 sometime between 1980 and 1981.
(A.R. 219-220).  In 1986 or 1987, the plaintiff started his own

---

[1]  Although Mr. Kelly had initially claimed that his disability
commenced on December 31, 1995, he amended that onset date at the hearing
before the Administrative Law Judge to November 1, 1997 so as to coincide with
the date he turned 50.  (Administrative Record, p. 217).

[2]  See, e,g., 42 U.S.C. §423; Parker v. Barnhart, 244 F.Supp.2d 360,
368 (D. Del. 2002003), citing Barnhart v. Walton, 535 U.S. 212, 122 S. Ct.
1265, 1269, 152 L. Ed. 2d 330 (2002) and Flaten v. Secretary of Health and
Human Services, 44 F.3d 1453, 1459-60 (9th Cir. 1995).

masonry business in which he would secure and supervise the
masonry jobs and keep the books, but would hire outside sub-
contractors to actually do the physical work, as he was unable to
do it himself.  According to the plaintiff and his wife, there
were instances where he would drive to a job site and Mrs. Kelly
would have to go pick him up, drive him home and help him out of
the truck because of pain in his back and/or neck.  (A.R. 226,
228).  He operated that business until 1994 or 1995.  For a brief
period of time commencing in 1992, Mr. Kelly also worked at
Community Options as a night-time aide, watching the residents,
assisting them with their baths, and washing their clothes.
Because he was unable to do much lifting, this job lasted less
than one year.  (A.R. 220-222, 229).  The plaintiff has not
worked since 1995.  (A.R. 223).

        The Kellys' also both testified that since at least 1990,
Mrs. Kelly has done most of the driving, and that since
approximately 1995 or 1996, Mr. Kelly can lift at most 15-20
pounds, provided that he's already standing straight up as he is
unable to reach down and pick something up.  When Mr. Kelly first
stopped working, his wife gave him a number of household chores
to do including vacuuming, washing and ironing clothes, taking
out the trash and washing dishes.  With the exception of putting
laundry into the washing machine and putting dishes into the
dishwasher, Mr. Kelly was unable to perform any of these tasks

without ending up bedridden from back pain.  (A.R. 227, 229-230).

Over a number of years, the plaintiff has used muscle relaxant and anti-inflammatory drugs, specifically Flexeril and a Medrol Dosepak, a TENS unit, a heating pad, over-the-counter and prescription painkilling medications including Motrin, Tylenol-3, Vicodin, and Percocet.  He spends most days either sitting or laying around his home.  Since Mr. Kelly stopped working, the couple has taken only one trip away from home when they took a cruise, but the plaintiff spent nearly all of his time in their cabin in bed.  (A.R. 227-228, 230-231).

In addition to the testimony from the plaintiff and his wife, the Administrative Record contains some medical records, most of which either pre-date 1995 or are subsequent to 2000. Those records reflect that in the 1994-95 period, the plaintiff had several x-ray, MRI and radiologic studies done of his lumbar and cervical spines, brain and abdomen, which evinced some mild spurring at C3 through C7, a small disc bulge at C5-C6, anterior spurring throughout much of the lumbar spine, a hiatal hernia, esophagitis, and non-specific white matter disease of the brain. In or around that time frame, Mr. Kelly was suffering from muscle spasms and acute pain after walking and sitting for even short periods of time.  The range of motion in his neck and lower back was limited and he had radiating pain down his legs.  He was treated conservatively with the Medrol Dosepak, Flexeril, Daypro

and Vicodin, and sent to physical therapy.  (A.R. 85-93) Ariel F. Abud, M.D. a neurologic surgeon, did not find any definite neurosurgical pathology when he saw the plaintiff in consultation for pain in the right side of the neck radiating down to the right elbow and down the left radiating to the index finger.  He suggested that he be put on a new traction apparatus using a total of 10 pounds for 15 minutes several times per day and that he undergo an EMG. (A.R. 192).

In November, 1997, the plaintiff was evaluated by an ophthalmologist for blurry vision and watery eyes.  According to the report generated from that examination, Mr. Kelly's medical history included hypertension, arthritis, a family history of diabetes and heart disease, and suspected glaucoma.  (A.R. 94-97).

There are no medical records whatsoever in the Administrative Record for the period between the date of Mr. Kelly's above-referenced eye examination on October 30, 1997 and February 29, 2000, when he had radiologic studies of his upper gastrointestinal tract and chest.  These tests showed a small sliding type hiatal hernia and mild degenerative changes in the thoracic spine.  There was then no evidence of cardiovascular disease. (A.R. 98-99).  On March 27, 2000, Plaintiff had an electrocardiogram, which was normal.  (A.R. 100-102).

In July 2000, Mr. Kelly underwent MRI of the lumbar spine

and he was seen again by Ariel F. Abud, M.D., neurologic surgeon, on July 25, 2000 for complaints of pain in the lower back, left hip, leg and back with numbness and tingling in the thumb and index finger of the left hand.  The MRI revealed and Dr. Abud found that he had a herniated disc at L3-4 and scar tissue or a small recurrent disc at that level from his previous surgery, as well as disc degeneration at multiple levels and a diffuse annular bulge at L2-3.  He prescribed Darvocet, and Vioxx as well as a high lumbosacral support.  Dr. Abud recommended that Mr. Kelly have an EMG to rule out lumbar radiculopathy and asked that he return for follow-up after those studies were completed but there are no records of any immediate follow-up visits.  (A.R. 190-195).

On June 21, 2001, Mr. Kelly had a CT scan of the brain and an MRI of the right shoulder.  The brain scan was normal, but the MRI showed probable degenerative tendinopathy and/or tendinitis in the shoulder.  (A.R. 103, 115).  An MRI of the brain was done on September 27, 2002, due to a head injury some 6 weeks prior, which evidently caused some problems with the plaintiff's sense of smell.  The MRI showed some patchy non-specific ischemic changes and some possible polyps in the sinuses, but was otherwise negative.  (A.R. 106-108).

In November, 2003, the plaintiff had an ultrasound of the thyroid which was negative and he was briefly hospitalized in

April, 2004, for chest pain, which was ultimately diagnosed as
having been caused by his esophageal reflux disease and
heartburn.  (A.R. 109-110).

The records further indicate that in the Fall of 2004, Mr.
Kelly began actively treating for what was characterized as
chronic neck and back pain with Daren J. Aita, M.D.  His primary
complaints at that time were severe and constant neck pain
radiating from his neck to the thumb and index finger; his
cervical range of motion was found to be quite limited.  After
having additional MRIs, as well as an EMG and a nerve conduction
study done, Mr. Kelly was diagnosed as having disc herniations at
the C5-C6 level, with narrowing at C6, mild disc bulges at C2-C3,
C3-C4 and C6-C7 and overall cervical radiculopathy.  (A.R. 116-
120).

The Administrative Record also contains copies of the
office/progress notes from what appears to be Mr. Kelly's primary
care doctor, Arthur Pacia, M.D. for various dates between 2000
and 2005.  It appears from those notes that the plaintiff was
seen every several months or so for ongoing complaints of low
back, neck and right shoulder pain and for continuing treatment
of cerebrovascular disease, high blood pressure, gastro-
esophageal reflux/gastroduondenal disease, and elevated
cholesterol.  His medication regime for these conditions included
Hydrochlorothiazide, Pravachol, Verelan, Cozaar, Percocet,

Prevacid and Tricor.  In March and April 2005, the plaintiff was
again seen by Ariel F. Abud, M.D., with complaints of pain and
limited range of motion in the neck and lower back.  Dr. Abud
diagnosed him as then having a herniated disc at C5-C6 with a C6
radiculopathy, and foraminal stenosis at L2-L3 and L3-L4.  Dr.
Abud recommended that he undergo a C5-6 anterior discectomy, but
there is no evidence that this was ever done.  (A.R. 193-196).

Judge Garrety issued her decision on March 24, 2007 upholding
the denial of benefits, as she was unable to find that the
plaintiff was disabled on or before his date last insured under
sections 216(i) and 223(d) of the Social Security Act.  (A.R. 22-
30).  On April 2, 2008, the Appeals Council denied the
plaintiff's request for review thus making the ALJ's
determination the final decision of the Commissioner.  (A.R. 5-
7).  Mr. Kelly then filed his complaint in this Court seeking
judicial review of this decision on April 25, 2008.  The case was
assigned to the undersigned and we referred it to U.S. Magistrate
Judge Carol Sandra Moore Wells for preparation of a Report and
Recommendation.  Judge Wells issued that Report and
Recommendation on July 1, 2009 and the Commissioner filed the
objections that are at issue here on July 7, 2009.

## **Standards of Review**

The District Courts have jurisdiction to review final
decisions of the Commissioner of Social Security under 42 U.S.C.

8

§405(g).   <u>Brownawell v. Commissioner of Social Security</u>, 554 F.3d
352, 355 (3d Cir. 2008).   Specifically, that statute provides, in
relevant part:

> Any individual, after any final decision of the Commissioner
> of Social Security made after a hearing to which he was a
> party, irrespective of the amount in controversy, may obtain
> a review of such decision by a civil action commenced within
> sixty days after the mailing to him of notice of such
> decision or within such further time as the Commissioner of
> Social Security may allow.   Such action shall be brought in
> the district court of the United States for the judicial
> district in which the plaintiff resides, or has his
> principal place of business or, if he does not reside or
> have his principal place of business within any such
> judicial district, in the United States District Court for
> the District of Columbia. ... The court shall have power to
> enter, upon the pleadings and transcript of the record, a
> judgment affirming, modifying, or reversing the decision of
> the Commissioner of Social Security, with or without
> remanding the cause for a rehearing.   The findings of the
> Commissioner of Social Security as to any fact, if supported
> by substantial evidence, shall be conclusive, ....   The
> court may, on motion of the Commissioner of Social Security
> made for good cause shown before the Commissioner files the
> Commissioner's answer, remand the case to the Commissioner
> of Social Security for further action by the Commissioner of
> Social Security, and it may at any time order additional
> evidence to be taken before the Commissioner of Social
> Security, but only upon a showing that there is new evidence
> which is material and that there is good cause for the
> failure to incorporate such evidence into the record in a
> prior proceeding; and the Commissioner of Social Security
> shall, after the case is remanded, and after hearing such
> additional evidence if so ordered, modify or affirm the
> Commissioner's findings of fact or the Commissioner's
> decision, or both, and shall file with the court any such
> additional and modified findings of fact and decision, and,
> in any case in which the Commissioner has not made a
> decision fully favorable to the individual, a transcript of
> the additional record and testimony upon which the
> Commissioner's action in modifying or affirming was based.
> Such additional or modified findings of fact and decision
> shall be reviewable only to the extent provided for review
> of the original findings of fact and decision.   The judgment
> of the court shall be final except that it shall be subject

to review in the same manner as a judgment in other civil actions. ...

In thus reviewing a final decision from the Commissioner, the district court's role is to determine whether that decision is supported by substantial evidence. Brownawell, supra. Substantial evidence does not mean a large or considerable amount of evidence; though more than a mere scintilla, it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Reefer v. Barnhart 326 F.3d 376, 379 (3d Cir. 2003). Stated otherwise, the court will not set the Commissioner's decision aside if it is supported by substantial evidence, even if it would have decided the factual inquiry differently. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

## Discussion

Under the Social Security Act, the Social Security Administration (SSA) is authorized to pay disability insurance benefits to persons who have a "disability." Barnhart v. Thomas, 540 U.S. 20, 21, 124 S. Ct. 376, 378, 157 L. Ed. 2d 333 (2003). It is of course axiomatic that to receive disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act, a claimant must show that he was insured under the program at the time of onset of his disability. Johnson v. Commissioner of Social Security, 529 F.3d 198, 200-201 (3d Cir. 2008), citing Kane v. Heckler , 776 F.2d 1130, 1131 n. 1 (3d Cir. 1985). It

should be noted that a "disability" is generally defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months" or blindness.  42 U.S.C. §§416(i), 423(d)(1).

The relevant period for purposes of establishing whether the plaintiff qualifies for DIB is the time between the alleged disability onset date and the date he was last insured.  <u>Johnson</u>, 529 F.3d at 201.  As discussed above, the parties here agree that Mr. Kelly's date last insured was June 30, 1999 and the onset date of his claimed disability was November 1, 1997.  It is thus incumbent upon us to review the Administrative Record in this matter and ascertain: (1) whether Mr. Kelly has sufficiently demonstrated that at the time he became disabled he was still insured and/or whether he was disabled within the meaning of Title II on his date last insured – June 30, 1999 and, (2) whether substantial evidence existed to support the ALJ's finding that the plaintiff "was not disabled under sections 216(i)[3] and 223(d)[4] of the Social Security Act at any time on or before his date last insured."

In reaching her conclusions, the ALJ applied the five-step

---

[3]   42 U.S.C. §416(i)

[4]   42 U.S.C. §405(d).

sequential evaluation prescribed in the Social Security
Regulations, 20 C.F.R. §404.1520 for determining whether an adult
claimant is disabled.[5]  In so doing, she found that Mr. Kelly:
(1) had not engaged in substantial gainful activity at any time
relevant; (2) had a severe back impairment; (3) did not have an
impairment or combination of impairments that met or medically
equaled one of the listed impairments in 20 C.F.R. §404.1520(d),
§404.1525 or §404.1526, (4) at all times on or before June 30,
1999 (his date last insured), had the residual functional
capacity to perform a full range of light exertion level work, as

---

[5]  Specifically, under this sequential evaluation process, the
following factors are considered:

(i) At the first step, work activity, if any, is considered.  If a
claimant is doing substantial gainful activity, he will be found to not
be disabled.

(ii) At the second step, medical severity of claimant's impairment is
considered.  If he or she does not have a severe medically determinable
physical or mental impairment that meets the duration requirement in
§404.1509, or a combination of impairments that is severe and meets the
duration requirement, the claimant will be found not disabled.

(iii) At the third step, medical severity of claimant's impairment is
again considered and if he or she has an impairment that meets or equals
one of the listings in appendix 1 and meets the duration requirement,
the claimant will be found to be disabled.

(iv) At the fourth step, the SSA will consider and assess the claimant's
residual functional capacity and his or her past relevant work.  If the
claimant can still do the past relevant work, he will be found not
disabled.

(v) At the fifth and final step, the SSA's assessment of the claimant's
residual functional capacity and age, education and work experience will
again be considered to determine if he or she can make an adjustment to
other work.  If he is found to be able to make an adjustment, he will
not be found to be disabled.  If he is found to be unable to make an
adjustment, he will be found to be disabled.

See, 20 C.F.R. §404.1520(a)(4).

there was no objective medical evidence showing that he was
unable to lift/carry up to 20 pounds, stand/walk about six hours
in an eight-hour workday and sit intermittently for the remaining
two hours.  Finally, the ALJ found that Mr. Kelly was able to
perform past relevant work on or before his date last insured as
his past work activity as a masonry supervisor did not entail
duties outside of his residual functional capacity.

     After carefully reviewing the administrative record in this
matter, we find that ALJ Garrety's findings *are* supported by
substantial evidence and it is for this reason that we decline to
adopt Judge Wells' Report and Recommendation.  As previously
discussed, it was the claimant's burden to demonstrate that he
was disabled within the meaning of Title II of the Social
Security Act *on or before his date last insured.*  To be sure, the
only evidence that the plaintiff was disabled as of that date
came from Mr. and Mrs. Kelly themselves and their testimony on
this point is, we find, uncertain at best as to the extent and
degree of disability during the 1997 to 1999 time frame.  We are
cognizant of the maxims that "[a]n ALJ should give 'treating
physicians' reports great weight, especially when their opinions
reflect expert judgment based on a continuing observation of the
patient's condition over a prolonged period of time,'" and "that
contradictory medical evidence is required for an ALJ to reject a
treating physician's opinion outright."  Brownawell, 554 F.3d at

13

355, quoting <u>Morales v. Apfel</u>, 225 F.3d 310, 317 (3d Cir. 2000) and <u>Plummer v. Apfel</u>, 186 F.3d 422, 429 (3d Cir. 1999).  Here, however, the Administrative Record is devoid of any physicians' opinions on whether the plaintiff is or is not disabled and, in fact, is devoid of any medical records whatsoever between 1997 and 1999, with the exception of the one report from Mr. Kelly's opthamologist.  The only other testimony in this matter came from a vocational expert, Nancy Harter, who opined that while Mr. Kelly still had the skill level needed to check masonry work to ensure that it was done properly, it would be hard to expect him to function outside of his home given his inability to do simple chores inside the home.  (A.R. 234-235).  Ms. Harter's testimony, however, concerned Mr. Kelly's *present* ability to work – it did not address whether or not he was disabled as of his date last insured.  Accordingly, we can find nothing in the record that would give reason to disturb the ALJ's findings and conclusions. We shall therefore affirm the decision of the Commissioner.

An order follows.